1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9   Thomas P. Sciranko,                    )   No. CV 05-02806-PHX-NVW
                                           )
10                 Plaintiff,              )   **ORDER**
                                           )
11  vs.                                    )
                                           )
12                                         )
    Fidelity & Guaranty Life Insurance)
13  Company, a Maryland corporation,       )
                                           )
14                 Defendant.              )
                                           )
15  _____)

16                         Table of Contents

17  I.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18         A.    Sciranko's Preexisting Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19         B.    The Insurance Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20         C.    The Terms of the Policy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21         D.    Sciranko's Disability Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22  II.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

23  III.   The Insurance Application is Admissible as Evidence . . . . . . . . . . . . . . . . . . . . . 16

24  IV.    There is a Genuine Issue of Material Fact as to Whether Fidelity Breached
           the Insurance Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
25
           A.    There is No Genuine Issue of Material Fact as to Whether the
26               Coverage Exclusion for Undisclosed Preexisting Conditions Applied
                 on its Own Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
27
                 1.    Sciranko's Claimed Disability Resulted from his
28                     Preexisting Conditions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2.  Sciranko Did Not Disclose his Preexisting Conditions Despite his Awareness of Them  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   a.  Although there is a Genuine Dispute Regarding Whether Sciranko Orally Disclosed his History of Angina, it is Not Material Because Sciranko Had an Opportunity to Review his Application and Made no Changes . . . . . . . . . 22

   b.  Sciranko Was Aware of His History of ASHD and Hyperlipidemia but Did Not Disclose Those Conditions  . . 25

B.  There is a Genuine Issue of Material Fact as to Whether Fidelity's Denial of Benefits Violated the Incontestability Clause in Sciranko's Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   1.  Sciranko's Incontestability Clause Prohibits a Denial of Benefits After Two Years for Mere Failure to Disclose a Preexisting Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   2.  The Incontestability Clause Permits a Denial of Benefits After Two Years in the Case of Fraud, But Fraud Has Not Been Argued on this Motion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

V.  Fidelity Did Not Exhibit Bad Faith in Processing and Denying Sciranko's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

   A.  There is No Genuine Dispute that Fidelity Acted in an Objectively Reasonable Fashion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

   B.  Even Assuming that Fidelity Acted Unreasonably, There is No Evidence that Fidelity Acted in a Consciously Unreasonable Manner . . . 43

1    Pending before the court is Defendant's Motion for Summary Judgment (Doc. # 34).

2  **I.    Background**

3    This action in diversity raises the question of whether Defendant Fidelity & Guaranty

4  Life Insurance Company ("Fidelity") permissibly denied disability benefits to Plaintiff

5  Thomas P. Sciranko on the ground that he failed to disclose preexisting medical conditions

6  on his insurance application. Fidelity is a Maryland Corporation. Sciranko is a 45 year-old

7  resident of Arizona. The facts are partially disputed.

8    **A.    Sciranko's Preexisting Conditions**

9    Sciranko's history of significant health problems dates back to his mid-20s, when he

10  began to experience episodes of what he interpreted to be anxiety attacks. The attacks

11  occurred several times a year and manifested through shortness of breath, sweating, and an

12  uncontrollable, racing heartbeat. Sciranko managed the condition with Valium and the anti-

13  anxiety medication Xanax.

14    In 1993, Sciranko began to experience moderate chest pain that correlated with

15  physical activity and, unlike his anxiety attacks, moderated with rest. Doc. # 45, Exh. 3 at

16  37. On December 7, 1993, Kirit P. Gosalia, M.D., a board-certified cardiologist and

17  specialist in internal medicine, diagnosed the pain as indicative of angina pectoris and

18  coronary artery disease and prescribed Adalat, a calcium channel-blocking drug that is used

19  to treat both angina and high blood pressure. *Id.* at 14, 20. Gosalia cannot recall explaining

20  the diagnoses to Sciranko, but he has a "clinical habit" and "blanket policy" of explaining

21  his diagnoses and test results to all of his patients. Doc. # 45, Exh. 4 at 8, 32. Sciranko

22  specifically remembers Gosalia's explanation of the diagnosis of angina, Doc. # 45, Exh. 3

23  at 42-43, and he remembers independently researching to learn more about that condition,

24  *id.* at 43, but he cannot recall being told of the additional diagnosis of coronary artery

25  disease, *id.* at 45. Billing records indicate that Gosalia used a diagnostic code for coronary

26  artery disease to charge Sciranko's insurance carrier for six additional visits involving

27  electrocardiogram testing and other evaluations from February 1994 to January 1996. Doc.

28  # 35, Exh. E at 1; Doc. # 45, Exh. 4 at 37. All other records of Sciranko's visits during this

1

1  period have been destroyed pursuant to Gosalia's record retention policy, and Sciranko did
2  not receive further care from Gosalia until 2004. *Id.* at 32.

3      Meanwhile, Sciranko started to receive his primary medical care from Sudeep S.
4  Punia, M.D., a board-certified internist, in May 1999. In a health history form completed and
5  signed at the time of his first visit, Sciranko explained that his angina was a "serious illness,"
6  and he circled "yes" in response to a question asking whether he ever had "heart disease."
7  Doc. # 35, Exh. D at 1. Punia's notes indicate that Sciranko had a history of arteriosclerotic
8  heart disease ("ASHD"), angina, and hypercholesterolemia, and that his prescriptions
9  included Adalat, aspirin, and Lipitor. Doc. # 45, Exh. 6 at 223. Describing Sciranko's
10  treatment plan, Punia wrote "continue past medication" and "watch salt and fat in diet." *Id.*
11  at 224. Punia also indicated an intention to "obtain previous medical records and review"
12  and require Sciranko to receive education and counseling on his coronary artery condition.
13  *Id.*

14      Punia examined Sciranko several more times over the course of the next two years.
15  On March 21, 2000, he performed a complete physical examination and assessed that
16  Sciranko continued to suffer from ASHD and hypercholesterolemia. Doc. # 45, Exh. 6 at
17  220. He prescribed Zocor for Sciranko's cholesterol as a substitute for Lipitor and continued
18  use of Adalat. From another examination on May 18, 2001, Punia wrote that Sciranko had
19  "controlled" blood pressure but suffered from swelling in both legs and discomfort in his
20  upper chest. *Id.* at 217. He again noted that Sciranko had ASHD and "hyperlipidemia," a
21  term often used interchangeably with hypercholesterolemia, and he scheduled for Sciranko
22  to receive an electrocardiogram. *Id.* Although normal triglyceride and total cholesterol
23  levels are each less than 200 milligrams per deciliter, blood tests showed that Sciranko's
24  levels were respectively 1489 and 446. *Id.* at 233. Sciranko was informed of these test
25  results at 10:15am on May 25, 2001. A handwritten note on the results form states, "watch
26  fat and cholesterol in diet." *Id.* On July 16, 2001, Punia found that Sciranko continued to
27  suffer anxiety attacks associated with "sweating, heart races, [and elevated] breathing." *Id.*
28

at 216.  Although Sciranko had previously smoked cigarettes for years, he quit in August 2001 and switched to a nicotine patch in September 2001.  Doc. # 45, Exh. 3 at 88-90.

Sciranko argues that there is a factual dispute as to whether Punia ever informed him of the diagnoses of coronary artery disease and hyperlipidemia between 1999 and 2001. Although Sciranko cannot recall how Punia became aware of the diagnoses, Sciranko is sure that his own unawareness of the diagnoses precluded him from informing Punia, and he recalls that Punia never explained to him that he was diagnosing ASHD, angina, or hypercholesterolemia.  *Id.* at 54-55, 69-70.  Punia has a "clinical habit" of discussing diagnoses with patients and presumes that he talked with Sciranko about each of the three heart conditions, but he concedes that it is a "reasonable possibility" that he and Sciranko did not discuss the conditions "at length" during the course of their visits because Gosalia was presumed to be providing treatment.  Doc. # 45, Exh. 5 at 23, 25-26, 51.  Punia nevertheless testifies that he received his information about each of the three heart conditions from Sciranko himself.  *Id.* at 15-17, 19-20.

### B.    The Insurance Application

On September 26, 2001, Thomas Kearney contacted Sciranko by telephone after learning that Sciranko was interested in purchasing a life insurance policy with a disability income rider.  Kearney was an independent contractor who sold policies for Fidelity from approximately 1998 to late 2001 under an agreement with the insurance broker American Classic Agency ("ACA").  He had approximately eleven total years of prior experience as an insurance salesperson for a number of different companies.  His agreement with ACA entitled him to leads on potential customers such as Sciranko in exchange for a fee.  When Kearney first started selling for ACA, he received a commission of 65% of the total annual premium on each policy he sold.  ACA paid Kearney 75% of the value of the commission at the time of the sale and disbursed the remaining 25% after the first nine months of the policy.  By the end of his agreement with ACA in late 2001, Kearney's commissions had reached 85% of the total annual premium on each policy sold. The first year of a policy term was financially significant to Kearney because he received "very little" from

ACA–approximately 2% of the value of a premium–for policy renewals.  Doc. # 45, Exh. 1 at 13.

The purpose of Kearney's phone call on September 26 was to make a preliminary determination as to whether Sciranko was eligible for coverage.  Kearney had the impression from his prior experience that health conditions such as heart attacks, arteriosclerotic heart disease, unregulated high blood pressure, angina, and unregulated high cholesterol would likely prevent approval of a life insurance application.  A Client Qualification Information sheet filled out by Kearney during the course of the phone call and based on details provided by Sciranko indicates that Sciranko did not smoke at the time and that Sciranko had experienced "controlled" high blood pressure for ten years.  Doc. # 49, Exh. B; Doc. # 45, Exh. 1 at 26-28.  Kearney did not ask about Sciranko's medications during the phone call.  Although Kearney otherwise asked "all [of] the qualifying questions" in the insurance application, no other conditions were noted.  *Id.* at 27, 29.

Finding no reason why Sciranko would fail to qualify for coverage on the basis of the preliminary information obtained on September 26, Kearney visited Sciranko's home on October 5, 2001, to help him complete the insurance application.  The application asked a series of questions about Sciranko's health.  It was noted on Page 1 that Sciranko visited Punia in approximately August 2001 for a "blood test for [high blood pressure]."  *Id.* at 1. Question 6 asked:

> Has any person proposed to be insured used tobacco in any form:
>
> > (a) within the past 12 months?  (*If yes, specify type and date last used in the area below.*)
> >
> > (b) within the past 5 years?  (*If yes, specify type and date last used in the area below.*)

Doc. # 35, Exh. A at 2.  Although Sciranko acknowledges in his deposition that he smoked until approximately two months prior to the date of his application, "no" was filled in as the answer to Questions 6(a) and (b).

Question 7 read in relevant part:

4

> Within the past 10 years, has any person proposed to be insured been treated for or diagnosed by a physician or other health care professional as having: (*If Yes, circle applicable condition.*)
>
> (a)     Any disorder or disease of the blood or circulatory system (such as: heart disease, palpitations, rheumatic fever, heart murmur, angina or chest pain, high blood pressure, stroke, anemia), respiratory system (such as: emphysema, tuberculosis, asthma, bronchitis), brain or nervous system (such as: convulsions, epilepsy, fainting spells, mental illness, or Alzheimer's disease), urinary tract (such as: kidney or bladder), reproductive system, stomach, intestines, liver, or gallbladder (such as: ulcer, colitis), endocrine system (such as: diabetes, thyroid), or muscles or bones (such as: arthritis, gout, back problems)?

*Id.* In columns to the right of the question where blanks for "yes" or "no" could be marked, the blank next to the word "yes" was filled in. The blank for the word "no" was filled in and also crossed out with an "X." Despite the absence of any indication of a history of high blood pressure, the term "high blood pressure" within the text of the question was also circled in pen. No markings were made to indicate Sciranko's history of angina, hyperlipidemia, and ASHD.

The relevant portion of the ensuing Question 8 read as follows:

> Within the past 5 years, has any person proposed to be insured:
>
> (a) Been in a hospital, clinic, sanatorium, or other medical facility for operation or advised to have surgery, observation, or treatment, seen a doctor, or been advised to and not done so?
>
> (b) Had electrocardiogram, X-ray, or other diagnostic tests, or been advised to and not done so?
>
> (c) Been or is now disabled, or had or now have any other mental or physical disorder not listed?

*Id.* Question 8(a) was answered "yes." The answer to Question 8(b) was indicated as "no" despite evidence that Sciranko received an electrocardiogram in approximately May 2001. *See* Doc. # 45, Exh. 6 at 217.

In a section for "Additional Information" that is located below Questions 7 and 8, it was noted that Sciranko has "[high blood pressure]–maintained very well for 10 years with Adalat 60 mg 1 time a day." *Id.* The application closes with a section entitled "Authorization," which reads in part, "I have read the questions and answers on this

5

1  application.  The statements made in this application are: complete; true; and correctly

2  recorded."  *Id.*  The application is signed by Sciranko and certified by Kearney.  Sciranko

3  made no subsequent effort to change the recorded answers.

4       The parties dispute the events leading up to the completion of the insurance

5  application.  According to Sciranko, he and his wife, Lauren C. Sciranko, sat down at a table

6  across from Kearney and reviewed the terms of the policy.  Once Sciranko confirmed his

7  interest in applying for coverage, Kearney pulled out the application, read aloud and verbatim

8  all of relevant questions except for Question 6, and personally marked Sciranko's articulated

9  answer to most of the questions.  Lauren Sciranko testifies that Kearney neglected to ask

10  about tobacco consumption under Questions 6(a) and (b), but Thomas Sciranko testifies that

11  Kearney did in fact ask those questions by orally paraphrasing them.  Doc. # 45, Exh. 2 at

12  55.  After Kearney finished reading the questions and marking Sciranko's answers, he turned

13  the application over to Sciranko, who promptly provided a signature.  The Scirankos did not

14  review the answers that Kearney recorded.  Doc. # 45, Exh. 3 at 27.

15       Some of the answers noted by Kearney purportedly failed to accurately reflect

16  Sciranko's oral answers.  Sciranko testifies that the answers to Question 6 incorrectly

17  indicate that he had not smoked within the 12 months leading up to the date of the

18  application. He also testifies that he never indicated a history of high blood pressure in

19  response to Question 7 and that, indeed, he had never even suffered from that condition.

20  Although the notations pertaining to his use of Adalat were accurate, he took the medication

21  for angina, not high blood pressure.

22       The explanations for the inaccuracies vary.  Thomas Sciranko attributes the inaccurate

23  answer to Question 6 to Kearney's decision to paraphrase the question rather than read its

24  text verbatim.  He states that Kearney simply asked whether he currently smokes rather than

25  whether he had smoked in the recent past, so he answered "no" because that was the correct

26  answer "at that moment."  Doc. # 45, Exh. 3 at 91, 97.  Sciranko's wife, on the other hand,

27  testifies that Question 6 was incorrectly answered by Kearney himself without any input from

28  Sciranko.  With regard to Question 7, Sciranko cannot recall whether he told Kearney about

his history of angina or explain why the noted answers to the application lack any reference to that condition or Sciranko's treatment with Gosalia. *Id.* at 28-29. He attributes the reference to high blood pressure to error by Kearney. *Id.* at 40. Sciranko's wife, on the other hand, testifies that Kearney was in fact told of Sciranko's angina but simply did not write it down. Doc. # 45, Exh. 2 at 45-46. Sciranko believes that he did not disclose his Lipitor prescription because he was not actually taking Lipitor at the time, Doc. # 45, Exh. 3 at 58, but he cannot explain why his Zocor prescription was also left undisclosed, *id.* at 67. He further testifies that he had no knowledge of whether high blood pressure or cholesterol would affect his ability to obtain insurance from Fidelity. *Id.* at 140.

Kearney tells a different story. He testifies that when he sat across from Sciranko and his wife, he provided them with a separate, blank copy of the insurance application and instructed them to read each question silently to themselves. After Sciranko finished reading each question, he stated his answer to Kearney, who in turn accurately wrote the expressed answer down on his own, official copy of the application. Doc. # 45, Exh. 1 at 34. In response to Question 7, Sciranko initially stated that he had not suffered from any of the listed conditions. However, when Kearney pointed out that Sciranko had already disclosed a history of high blood pressure on Page 1 of the application, Sciranko changed his answer and indicated that he takes Adalat for high blood pressure. *Id.* at 35. Kearney recalls that Sciranko never disclosed his history of angina, hyperlipidemia, ASHD, anxiety attacks, or examinations with Gosalia. Once all of the questions were answered, Kearney had the Scirankos review the application and sign it. Sciranko never indicated that he failed to understand any of the questions presented to him.

After Sciranko completed his application, Kearney arranged on October 8, 2001, for Marcella Bappe, a nurse with Heritage Labs International, LLC, to visit Sciranko at his home to collect a urine sample and ask additional questions about his health. The examination was completed by the nurse on October 10. The form recording the results began with a question that read:

1

2

Within the past 10 years, have you had any known indication of or been treated for:

3

4

(a) Any disorder or disease of the . . . [b]lood or circulatory system, such as: chest pain, palpitation; high blood pressure; rheumatic fever; heart murmur; heart attack; anemia?

5  Doc. # 35, Exh. A at 3. This question was answered affirmatively on the ground that

6  Sciranko suffers from "hypertension diagnosed 1991." *Id.* The listed medication for this

7  condition was "Adalat 60 mg." *Id.* Notes on the application also indicate that Sciranko

8  received an electrocardiogram in 2001 from Punia and that he "[h]ad a checkup, consultation,

9  illness, injury or surgery" in the past five years. *Id.* However, the nurse did not note any

10 other heart examinations, conditions, or treatments, and she indicated that Sciranko had not

11 used tobacco "within the past 10 years." *Id.* Sciranko signed the application, representing

12 that "[t]o the best of [his] knowledge and belief, the statements made . . . are complete, true

13 and correctly recorded." *Id.* He cannot recall how the application came to be filled out or

14 explain why it omits reference to his cardiac diagnoses and treatments. Doc. # 45, Exh. 3 at

15 52-53. Kearney never communicated with the nurse about Sciranko's physical condition or

16 any other matter pertaining to his application. Doc. # 45, Exh. 1 at 48-49.

17 **C.   The Terms of the Policy**

18 On December 17, 2001, Fidelity issued Thomas Sciranko a $150,000 term life

19 insurance policy with a disability income rider that provides $1,500 in monthly benefits in

20 the event Sciranko becomes unable to substantially perform the essential duties of any

21 occupation for which he is qualified. Sciranko's official premium was higher than initially

22 quoted because the urine sample collected by Bappe on October 10 indicated the presence

23 of nicotine. The insurance certificate shows that the disability rider became effective on the

24 date of issuance.

25 The policy contains two relevant provisions. First, a "Benefit Limitations" provision

26 located within the disability rider states, "No disability income will be paid for any disability

27 which results from . . . [b]odily injury or disease, occurring before the effective date of this

28

rider, which was not disclosed on the application."  Doc. # 35, Exh. B at 2.  Second, an "Incontestability" provision within the disability rider states:

> We will not contest this rider's benefit for any Insured or Covered Dependent based on statements made in an application after that benefit has been in effect during the lifetime of that Insured or Covered Dependent for 2 years from:
>
> ● The certificate's Date of Issue if part of the certificate on that date; or
>
> ● The effective date of that Insured's or Covered Dependent's benefit if made a part of the certificate after the certificate's Date of Issue.

Doc. # 45, Exh. 7 at 27.

### D.    Sciranko's Disability Claim

Sciranko continued to suffer from his various heart conditions after Fidelity issued the term life insurance policy. *See, e.g.*, Doc. # 45, Exh. 6 at 210, 213, 267.  He underwent a six-vessel aorto-coronary bypass surgery on March 21, 2002, and was informed that his early "anxiety attacks" were actually mild heart attacks. *Id.* at 92, 133; Doc. # 45, Exh. 3 at 39. Punia noted continuing problems with coronary artery disease and hyperlipidemia in 2003. Doc. # 45, Exh. 6 at 201, 206, 263.  On March 26, 2004, Gosalia wrote a letter to Punia explaining that although Sciranko quit smoking and does not suffer from high blood pressure, he has a "history of very high cholesterol" and "obvious[] coronary artery disease." *Id.* at 160-61.  Cardiologist Rajendra Savajiyani, M.D., "strongly advised [Sciranko] to consider long-term disability" on March 14, 2005, due to his "severe, diffuse, three-vessel coronary artery disease," "history of six-vessel aortocoronary bypass surgery," and "history of hyperlipidemia." *Id.* at 185.  Additional bypass surgery was performed on March 24, 2005. *Id.* at 175.  According to Sciranko, Gosalia recommended that he avoid work and strictly limit his physical activity because he has "smaller arteries than the average person." Doc. # 45, Exh. 3 at 136.  Gosalia testifies that Sciranko should be confined to his house "because of his cardiac condition." Doc. # 45, Exh. 4 at 54.

Sciranko filed for disability insurance benefits on April 18, 2005.  He explained his disability as follows:

9

> Apparently this is something I just found out is hereditary–my coronary arteries are too small.  They clogged up 3 years ago and I had a 5-way by-pass open heart surgery.  Because those new arteries still fed into the small arteries they backed up and then clogged up again.  I ended up with chest pain again on 3-11-05 resulting with the need for more surgery.  Four stents were put in on 3-24-05.  No more surgery can be done except for heart transplant.

Doc. # 45, Exh. 6 at 126.  In support of the claim, Lauren Sciranko submitted a number of documents to William R. Barger, a senior claims examiner for Fidelity.  The documents included Thomas Sciranko's Claimant's Statement of Disability, contact information for his treating physicians, Lauren Sciranko's own summary of her husband's recent heart surgeries, hospital billing records, a hospital discharge statement listing Thomas Sciranko's medications and treatments, and a signed records release form.

On May 3, Lauren Sciranko separately submitted a signed Attending Physician's Statement from Gosalia indicating that Sciranko is disabled and confined to his house due to coronary artery disease and hyperlipidemia. *Id.* at 107-08.  Because Gosalia omitted some necessary information on Sciranko's medications and the date on which his symptoms first appeared, Lauren Sciranko independently inserted the missing information and initialed next to her additions.  In accordance with his "general understanding" of Fidelity's standard practice, Barger responded in a letter dated May 10 that Fidelity could not accept Gosalia's statement as submitted because it was not legible and fully completed by Gosalia himself.  Doc. # 45, Exh. 8 at 50; *see also* Doc. # 45, Exh. 9 at 52-53.  Barger also indicated that the claim would not be processed until a Claimant's Statement of Disability and a signed medical records release form had been submitted.  *Id.* at 109.  In retrospect, Barger is not sure why Sciranko was asked to resubmit those forms after having already submitted them on April 18.  Doc. # 45, Exh. 8 at 56.

Lauren Sciranko resubmitted the signed release form and the disability statement from her husband again on May 14, 2005.  She also resubmitted Gosalia's initial statement despite Fidelity's indication that it was unacceptable.  If Fidelity still found the statement deficient, she explained, the company should call Gosalia for additional information.  Lauren

10

1    Sciranko's letter further indicated that she wished to handle personally her husband's
2    disability claim because his heart condition prevents him from safely handling stress.

3        Fidelity again rejected the submitted documents in a May 24 letter addressed to
4    Thomas Sciranko. Barger explained that Gosalia's original Statement remained illegible and
5    omitted information that must be supplied by the physician. He also explained that Fidelity
6    had begun to collect Sciranko's other medical records to determine whether he qualifies for
7    payments. *Id.* at 117. Barger did not call Gosalia, however, because his experience is that
8    physicians typically do not return calls from insurance companies, and in any event Fidelity
9    has a standard practice of making sure that physician statements are in writing. Doc. # 45,
10   Exh. 8 at 51; Doc. # 45, Exh. 9 at 38, 52-53. The purpose of the standard practice is to create
11   a "paper trail" for reference in the event of a claim dispute. Doc. # 45, Exh. 8 at 51; Doc. #
12   45, Exh. 9 at 52-53.

13       On May 27, 2005, Lauren Sciranko directed a letter of complaint concerning Barger's
14   conduct to Russell H. Laws, Fidelity's Assistant Vice President of Claims and Compliance.
15   The letter accused Barger of "obviously and purposely ignoring" Lauren Sciranko's requests
16   and asserted that Barger had acted improperly by refusing to accept Gosalia's statement,
17   refusing to contact Gosalia by phone to resolve any deficiencies in his statement, refusing
18   to return Lauren Sciranko's phone calls, and sending correspondence to Thomas Sciranko
19   despite instructions that Lauren Sciranko alone is handling the claim. *Id.* at 118. In
20   accordance with his understanding of an "internal policy" aimed at ensuring Fidelity's
21   compliance with federal privacy regulations, Laws responded with a June 17 letter explaining
22   that Lauren Sciranko must provide power of attorney documentation signed by Thomas
23   Sciranko in order for Fidelity to address her rather than her husband during the processing
24   of the claim. *Id.* at 51. Three days later, Lauren Sciranko submitted a complaint to the
25   Arizona Department of Insurance, Consumer Affairs Division, repeating the accusations
26   made against Barger on May 27.

27       On June 23, 2005, Thomas Sciranko received another letter from Barger stating that
28   Fidelity still needed a legible and complete statement from Gosalia. Barger explained that

1    Fidelity was in the process of collecting Sciranko's other medical records, but that if

2    Sciranko wished to expedite the process he could separately contact Punia to request that he

3    quickly send his records to Fidelity.  Barger contemporaneously sent a blank Employer's

4    Statement of Disability form to Thomas Sciranko's former employer to collect information

5    concerning the effect of Sciranko's condition on his ability to work.  Lauren Sciranko mailed

6    Fidelity power-of-attorney documentation and one of her husband's pay stubs as proof of

7    employment on June 29, 2005.

8        On June 30, 2005, Laws received a notice of Lauren Sciranko's complaint before the

9    Arizona Department of Insurance.  The notice requested an explanation of Fidelity's position

10   on the matter and supporting documentation.  Laws responded on July 19, indicating that

11   Thomas Sciranko's claim had been delayed because Fidelity had not received an Attending

12   Physician's Statement appropriately completed by Gosalia himself.  Laws also explained

13   that, despite Lauren Sciranko's assertion to the contrary, Fidelity was still in the process of

14   collecting necessary medical records.  Barger's prior correspondence requesting

15   documentation of Lauren Sciranko's power of attorney was explained as a reflection of

16   standard company policy aimed at ensuring claimant privacy.  The Arizona Department of

17   Insurance apparently decided not to take action against Fidelity after receiving this

18   explanation.

19       Barger sent additional letters addressed to Thomas Sciranko and his former employer

20   on July 20, 2005.  The former repeated that Fidelity still needed to obtain a legible and

21   complete statement from Gosalia, Punia's records, and an Employer Statement of Disability

22   prior to completing its evaluation of the claim.  The second letter repeated Fidelity's initial

23   request that Sciranko's former employer complete the statement form provided on June 23.

24       After receiving Punia's medical records, Fidelity denied coverage on July 28, 2005.

25   The stated basis for this decision was that medical records from May 7, 1999, March 21,

26   2000, and May 18, 2001, indicated that Sciranko had preexisting conditions of ASHD and

27   hyperlipidemia that were not disclosed on his initial insurance application.  Prior to denying

28   benefits, Fidelity did not seek a legal opinion on the proper disposition of the claim, and it

did not receive a statement from Sciranko's former employer or a completed statement from Gosalia.  Doc. # 45, Exh. 9 at 67, 71.  Laws testifies that although Fidelity requested those statements from Sciranko, the company does not have a policy that makes them mandatory to decide a claim.  *Id.* at 35.  Fidelity examiners have discretion to look for preexisting conditions and decide claims even without an entire record once the proper outcome of a claim becomes apparent.  *Id.* at 39-40.  Claims processing is "never" delayed solely for lack of an employer's statement because it is Fidelity's experience that employers rarely cooperate anyway.  *Id.* at 64-65.

Sciranko's claim was denied despite the incontestability clause in his policy because neither Laws nor Barger viewed the clause as relevant.  Laws believes that incontestability clauses in Arizona preclude insurance carriers from disputing the validity of a policy after two years, but not from disputing coverage for particular claims under an admittedly valid policy.  *Id.* at 40.  He obtained this understanding from unspecified Ninth Circuit precedent, legal summaries produced by the American Counsel of Life Insurers, and an internal memorandum from Fidelity's legal department that lists states in which an incontestability clause will apply to both disputes over the validity of a policy and disputes over the scope of coverage.  *Id.* at 41-42, 87-88.  Because the internal memorandum does not mention Arizona, Laws inferred that the State permits Fidelity to deny coverage on the basis of a preexisting condition even after two years from the issuance of the policy.  *Id.*  Barger possessed the same view based on Fidelity's internal memorandum and training he received from the company.  Doc. # 45, Exh. 8 at 81, 84-85, 91, 93.

Barger and Laws both possessed a general understanding of the common law duty of good faith and fair dealing at the time they processed Sciranko's claim.  Barger was "trained generally" on the duty while employed at Fidelity and understands it to require insurance carriers to process claims in an "open arm's length manner."  *Id.* at 9, 16.  Although he cannot remember many of the details pertaining to how he processed Sciranko's claim, Barger generally made efforts to comply with the duty of good faith and fair dealing by acting in accordance with the Fair Claims Practices Act, responding promptly to customer

1   complaints, reviewing claims thoroughly, and comparing case facts with policy language.

2   *Id.* at 16.  Barger did not have a checklist of the requirements for compliance with Fair

3   Claims Practices Act in Arizona, but he was trained to follow California's version of that

4   Act, and he understands California's requirements to be the strictest in the country.  *Id.* at 20.

5   As Barger's superior at Fidelity, Laws also received substantial training on the duty

6   of good faith and fair dealing.  He understands the duty to require Fidelity to "deal honestly

7   and fairly with people," "take a neutral approach to [its] investigations and consider all the

8   relevant information, both that provided by the insured and . . . discovered in [the]

9   investigation," and investigate claims "reasonably promptly."  Doc. # 45, Exh. 9 at 23, 36.

10  Laws also understands the duty to mean that one "should not needlessly ask for things for the

11  purpose of either delaying or . . . obstructing the settlement of a claim."  *Id.* at 24.  To ensure

12  compliance with the duty, Fidelity makes efforts to train its claims examiners, utilize a

13  quality-review process that requires Laws to review preliminary benefits determinations,

14  respond to customer communications, request required claim information, follow up with

15  customers, communicate clearly, conduct customer service performance reviews, and

16  monitor claims to limit the time of processing to no more than 90 days when possible.  *Id.*

17  at 20-22, 25-27, 30, 33.

18  Sciranko filed this action in response to Fidelity's denial of coverage.  Count I of the

19  Complaint alleges that Fidelity breached the insurance agreement by declining to provide

20  disability payments.  Count II alleges that Fidelity acted in bad faith by unreasonably denying

21  Sciranko's claim, failing to fully and fairly investigate the claim, misrepresenting policy

22  terms, creating unreasonable requirements for payment, engaging in "overt dishonesty," and

23  subjecting Sciranko to "offense, insult and personal abuse."  Doc. # 1 at 8.  Fidelity now

24  moves for summary judgment.

25  **II.   Standard of Review**

26  Rule 56(c), Fed. R. Civ. P., provides that summary judgment is proper when "the

27  pleadings, depositions, answers to interrogatories, and admissions on file, together with

28  affidavits, if any, show that there is no genuine issue as to any material fact and that the

14

1   moving party is entitled to a judgment as a matter of law." A "genuine issue" of material fact

2   will be absent if, "viewing the evidence and inferences which may be drawn therefrom in the

3   light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter

4   of law." *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th Cir. 1977); *see also*

5   *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). The evidence presented

6   by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory and speculative

7   testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and

8   to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738

9   (9th Cir. 1979).

10        The party seeking summary judgment bears the initial burden of informing the court

11   of the basis for its motion and identifying those portions of the pleadings, depositions,

12   answers to interrogatories, and admissions on file, together with the affidavits, if any, which

13   it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp.*

14   *v. Catrett*, 477 U.S. 317, 323 (1986). The nature of this responsibility varies, however,

15   depending on whether the movant or the non-movant would bear the burden of persuasion

16   at trial with respect to the issue at hand. If the burden of persuasion would be on the

17   nonmoving party, the party moving for summary judgment may carry its initial burden of

18   production under Rule 56(c) by introducing "evidence negating an essential element of the

19   nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving

20   party does not have enough evidence of an essential element of its claim or defense to carry

21   its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

22   F.3d 1099, 1105-06 (9th Cir. 2000); *High Tech Gays v. Defense Indus. Sec. Clearance*

23   *Office*, 895 F.2d 563, 574 (9th Cir. 1990). On the other hand, if the burden of persuasion at

24   trial would be on the party moving for summary judgment, that party may satisfy its initial

25   burden of production only by showing that it would be "entitle[d] . . . to a directed verdict

26   if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th

27   Cir. 1992); *cf. Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) ("A directed verdict is

28   proper when the evidence permits only one reasonable conclusion.").

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985).   Summary judgment is appropriate against a party who "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986) (nonmovant's showing of "some metaphysical doubt" as to material facts insufficient); *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994).   Summary judgment is not appropriate when the nonmoving party identifies or produces evidence from which a reasonable juror, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor.   *United States v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999).

## III.   The Insurance Application is Admissible as Evidence

Sciranko opposes the motion for summary judgment in part by arguing that the insurance application is inadmissible under A.R.S. § 20-1108(A) because a "true copy" of the application was not attached to the policy at the time the policy was issued and delivered. The relevant portion of the statute reads:

> No application for the issuance of any life or disability insurance policy or contract shall be admissible in evidence in any action relative to such policy or contract, unless a true copy of the application was attached to or otherwise made a part of the policy when issued and delivered.[1]

---

[1] Federal Rules of Evidence, rather than state rules of evidence, generally govern in diversity actions. *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003). However, a state rule of evidence will govern if it is "intimately bound up" with the state's "substantive decisionmaking." *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir. 1995). Section 20-1108(A) satisfies this standard.  The statute reflects Arizona's concern that it would be unfair to bind an insurance applicant to misstatements on an insurance application if the applicant lacked a prior opportunity to review and correct those statements. *See Marine v. Allstate Ins. Co.*, 12 Ariz. App. 229, 230-31, 469 P.2d 121, 122-23 (Ct. App. 1970).  The State rule therefore applies.

16

The record contains a copy of the insurance policy to which only one page of the insurance application is attached. *See* Doc. # 45, Exh. 7. Because the application contained multiple pages, that first page alone cannot constitute a "true copy" of the application. However, Sciranko submits no evidence to indicate that the copy of the insurance policy and application that is contained in Exhibit 7 is the same copy that was delivered to him at the time of issuance. Kearney also testifies that he hand-delivered to Sciranko a "complete copy of the Policy with a complete copy of both parts of the application attached thereto" on November 14, 2001. Doc. # 55, Affidavit of Thomas Kearney at 2. On January 15, 2002, Kearney also sent via certified mail a "complete copy of the re-issued Policy with complete [sic] copy of both parts of the application and amendment attached thereto." *Id.* at 4.

Rather than dispute the accuracy of Kearney's affidavit, Sciranko attempts to distinguish the "mailing" of a true copy of a policy and application from the statutorily envisioned "delivery" of the same. However, the distinction is not supported by any case authority and is nonsensical. Sciranko's insurance application will be considered as evidence.

**IV.    There is a Genuine Issue of Material Fact as to Whether Fidelity Breached the Insurance Contract**

Fidelity contends that no material facts are genuinely disputed and moves for summary judgment on the ground that while incontestability clauses are traditionally limited to prohibiting defenses regarding the validity of a policy more than two years after the date of issuance, they do not prohibit a defense based on a policy exclusion for preexisting conditions because that defense only concerns the scope of coverage. For the reasons explained below, the Motion for Summary Judgment will be denied with respect to Count I.

**A.    There is No Genuine Issue of Material Fact as to Whether the Coverage Exclusion for Undisclosed Preexisting Conditions Applied on its Own Terms**

To determine whether Sciranko was appropriately denied benefits, it first must be decided whether Fidelity's coverage exclusion for undisclosed preexisting conditions applied

17

on its own terms. The text of the exclusion reads, "No disability income will be paid for any disability which results from . . . [b]odily injury or disease, occurring before the effective date of [the disability] rider, which was not disclosed on the application." Doc. # 35, Exh. B at 2. Sciranko asserts that this language does not apply because his disability "results from" heart attacks that he suffered after the issuance of the policy and from his recently discovered problem of congenitally narrow arteries, rather than undisclosed preexisting conditions. Doc. # 45 at 8-9; Doc. # 47 at 13. Sciranko also argues that the exclusion does not apply because he disclosed all preexisting conditions of which he was aware. The evidence underlying these contentions is insufficient to create a genuine issue of material fact concerning the applicability of the coverage exclusion.

### 1. Sciranko's Claimed Disability Resulted from his Preexisting Conditions

The provisions of insurance policies in Arizona must be construed "according to their plain and ordinary meaning." *Sparks v. Republic Nat'l Life*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). Language that would be considered ambiguous by an individual "not trained in law or in the insurance business" is construed against the insurer. *Id.*, 647 P.2d at 1132. While the insured carries the burden to establish coverage under an insuring clause, the insurer must establish the applicability of any exclusion. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct. App. 2000).

Neither party argues that the exclusion for preexisting conditions is vague or ambiguous in its use of the phrase, "results from." As a verb, "result" means to "arise as a consequence, effect, or conclusion." Oxford English Dictionary 1573 (Compact ed. 1991). The exclusion therefore applies when a claimed disability "arise[s] as a consequence, effect, or conclusion" from a bodily injury or disease that was occurring before the date of the policy's issuance and was not disclosed on the insurance application.

Because Fidelity denied coverage on the basis of a policy exclusion and is the party moving for summary judgment, it must show that it would be "entitle[d] . . . to a directed verdict if the evidence went uncontroverted at trial." *Houghton*, 965 F.2d at 1536; *see also*

1    *Keggi*, 199 Ariz. at 43, 13 P.3d at 788.  Fidelity has satisfied this burden.  Viewing the

2    evidence in the light most favorable to Sciranko and drawing all reasonable inferences in his

3    favor, the only reasonable conclusion is that Sciranko's claimed disability was a consequence

4    of his preexisting conditions of ASHD, hyperlipidemia, and angina. *Berry*, 39 F.3d at 1057.

5    On March 14, 2005, Savajiyani "strongly advised [Sciranko] to consider long-term disability

6    *due to* extremely severe underlying cardiac disease."  Doc. # 45, Exh. 6 at 185 (emphasis

7    added).  Savajiyani clarified the nature of Sciranko's "disease" by listing diagnoses of

8    "angina due to severe, diffuse, three-vessel coronary artery disease," a "history of six-vessel

9    aortocoronary bypass surgery," and a "history of hyperlipidemia." *Id.*  Gosalia's similar

10   finding of disability reflected his diagnoses of coronary artery disease and hyperlipidemia.

11   *Id.* at 107-08.  Punia and Gosalia repeatedly documented the presence of these conditions

12   prior to the date of Sciranko's insurance application.

13       Because of this evidence, the burden shifts to Sciranko to identify contrary evidence

14   that, when viewed in the light most favorable to him, could cause a reasonable juror to decide

15   in his favor. *Shumway*, 199 F.3d at 1103-04.  Sciranko has failed to satisfy this burden.  The

16   argument that heart attacks are the actual cause for the claimed disability simply begs the

17   question as to why Sciranko experienced heart attacks in the first place.  Sciranko, moreover,

18   cites no evidence to cast doubt on record evidence uniformly showing that his heart attacks

19   were products of his preexisting conditions.  Although the alleged disability may be viewed

20   as resulting more directly from Sciranko's heart attacks than the preexisting conditions that

21   caused those attacks, the causal chain is still sufficiently short to locate the claimed disability

22   within the terms of the coverage exclusion.  Sciranko makes no effort to argue otherwise.

23       Sciranko also fails to meet his burden in arguing that he is disabled exclusively

24   because of congenitally small arteries.  No medical record indicates that a physician found

25   him disabled solely because of that condition rather than ASHD, angina, and hyperlipidemia.

26   *See* Doc. # 45, Exh. 6 at 107-08, 185.  Even Sciranko's own allegations operate in significant

27   tension with the notion that he is disabled purely as a result of congenital arterial deformity.

28   The Complaint states that Sciranko "became totally disabled" "in about March of 2005."

Doc. # 1 at 6.  If a non-progressive, congenital condition were the exclusive source of the disability, it is difficult to see why Sciranko would suddenly become disabled at 45 years of age, during the particular month in which he happened to receive bypass surgery to counteract the effects of ASHD and hyperlipidemia.  Further undermining Sciranko's argument, the statement he provided to Fidelity on April 18, 2005, identified the sources of his disability as small arteries, "chest pain," and–in reference to ASHD–repeated surgery for "clogged" arteries.  Doc. # 45, Exh. 6 at 126.  That statement clarifies that original artery size was only one among several contributing causes for the alleged disability.  The coverage exclusion still applies in these circumstances because the presence of multiple causes of disability does not negate the causal relationship between the disability and each contributing cause; even if Sciranko's disability "results from" original artery size, it still also "results from" his ASHD, hyperlipidemia, and angina.

The only evidence cited in support of Sciranko's position is his own deposition testimony that Gosalia recommended limited physical activity because he has "smaller arteries than the average person."  Doc. # 45, Exh. 3 at 136.  When read in conjunction with other evidence pertaining to the nature of Sciranko's disability, it is clear that Gosalia was not identifying any congenital problem as the exclusive or even primary source of the claimed disability.  Indeed, no cited medical records mention congenital illness.  As indicated above, Gosalia's final disability assessment only rested on diagnoses of ASHD and hyperlipidemia.  Doc. # 45, Exh. 6 at 107-08.

Sciranko argues that the dispute over the cause of his claimed disability precludes summary judgment because it raises a complex medical question the resolution of which requires expert testimony.  Existing expert evidence in the form of assessments from Punia, Gosalia, and Savajiyani, however, already amply establishes the causal relationship between the preexisting conditions and the disability.  *See* Doc. # 45, Exh. 6 at 107-08, 185.  To the extent that Sciranko argues that additional expert testimony on causation is nevertheless required, his position finds no support in Arizona law.  Arizona Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Nothing in this Rule requires additional expert testimony in the context of this case. The California precedent Sciranko relies on to argue otherwise applies California rules of evidence that are inapposite here. *See Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 699, 11 Cal. Rptr. 3d 807, 860 (Ct. App. 2004); *Carson v. Facilities Dev. Co.*, 36 Cal. 3d 830, 844, 686 P.2d 656, 664 (1984). *Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998), is also distinguishable. Unlike that case, in which the plaintiff presented no evidence of causation to defeat a motion for summary judgment on her medical tort claim, the record now before the court is replete with evidence of causation between Sciranko's preexisting conditions and his disability. *Cabrera* does not require what would amount to duplicative expert testimony. *Id.*

> **2.**     **Sciranko Did Not Disclose his Preexisting Conditions Despite his Awareness of Them**

Sciranko's final argument against the applicability of Fidelity's coverage exclusion is that he disclosed his angina to Kearney on October 5, 2001. Although Sciranko admits that he did not disclose his preexisting ASHD and hyperlipidemia, he appears to contend that his failure to do so is excused by his lack of awareness of those conditions at the time he signed the application.

The court rejects these arguments. An applicant for insurance is "under a duty to examine answers [noted on his application] to determine if they are accurate and complete." *Stewart v. Mut. of Omaha Ins. Co.*, 169 Ariz. 99, 107, 817 P.2d 44, 52 (1991). Even if an insurance agent makes mistakes in recording the applicant's answers, the applicant becomes bound by the answers as recorded if he does not subsequently correct them despite having the opportunity to do so. *Marine*, 12 Ariz. App. at 230-31, 469 P.2d at 122-23; *Greber v. Equitable Life Assurance Soc'y of the U.S.*, 43 Ariz. 1, 28 P.2d 817 (1934); *Stewart*, 169 Ariz. at 107, 817 P.2d at 52. The insurer is only prohibited from denying coverage on the

basis of the incorrect answers where its own agent fraudulently recorded them without the fault, knowledge, or collusion of the applicant and induced the applicant to sign the application without reviewing it. *Smith v. Republic Nat'l Life Ins. Co.*, 107 Ariz. 112, 117, 483 P.2d 527, 532 (1971).

> **a.   Although there is a Genuine Dispute Regarding Whether Sciranko Orally Disclosed his History of Angina, it is Not Material Because Sciranko Had an Opportunity to Review his Application and Made no Changes**

Fidelity has satisfied its initial burden in showing that its evidence, if uncontroverted at trial, would only reasonably permit the conclusion that Sciranko was aware of and failed to disclose his angina. Sciranko and his wife both concede that he was aware of the condition prior to the date of the insurance application. Doc. # 45, Exh. 3 at 42-43; Doc. # 45, Exh. 2 at 45-46. Sciranko even independently researched the condition to learn more about it after he received his diagnosis in 1993. Doc. # 45, Exh. 3 at 43. Fidelity also cites ample evidence that Sciranko failed to disclose the condition to Kearney. The preliminary questionnaire filled out by Kearney on September 26, 2001, was bereft of any reference to angina, and there is no testimony indicating that the omission is due to misconduct by Kearney. Doc. # 49, Exh. B. Kearney testifies that neither Sciranko nor his wife mentioned angina during the application interview. Doc. # 45, Exh. 1 at 35. Despite uncontroverted testimony that Kearney never contacted Marcella Bappe regarding Sciranko's physical condition, the nurse's records also omit any reference to angina and, in the absence of any contrary evidence, strongly suggest that Sciranko repeatedly failed to disclose that condition. Doc. # 35, Exh. A at 3.

Whether Sciranko has produced sufficient controverting evidence is a closer question. Sciranko cannot personally recall whether he told Kearney about his angina, Doc. # 45, Exh. 3 at 28-29, but he argues that the issue is nevertheless genuinely disputed in light of his wife's testimony that angina was revealed to Kearney during the application interview. The relevant portion of his wife's deposition testimony reads as follows:

> [Question by Defense Counsel:]   Now, when I read the application, there's no disclosure of a 1993 cardiologist

treatment with Dr. Gosalia, there's no disclosure of a diagnosis of angina, and there's no disclosure that Adalat was being prescribed for that angina.  Do you know why that is?

[Answer by Lauren Sciranko:] Because Mr. Kearney didn't write it down.

Q: So you are alleging that you told Mr. Kearney in October of 2001 that all the way back in 1993, your husband was told by a cardiologist that there was something wrong with his heart, that it was diagnosed as angina, and that he had prescribed Adalat for that angina?  Is that your testimony?

A: No.

Q: All right.  Well, I need to know.  Because I asked your husband this question as to why he didn't sue Mr. Kearney, and the lawyer instructs him not to answer that question, and we'll let the judge decide that issue.

But I need to know, since you claim you were in the room at the time, what are you alleging happened?  Are you alleging–we know one thing for true.  None of this, 1993 cardiac treatments and 1999 cardiac diagnoses, were disclosed on this October 2001 application.  Are you alleging you and your husband told Mr. Kearney all about that, and he just didn't write it down?

A: Yes.

Doc. # 45, Exh. 2 at 44-45.  Citing *Chanay v. Chittenden*, 115 Ariz. 32, 35, 563 P.2d 287, 290 (1977), and *Orme School v. Reeves*, 166 Ariz. 301, 311, 802 P.2d 1000, 1010 (1990), Fidelity objects that this testimony may not create a genuine dispute of material fact because it is internally contradictory.  While federal law, rather than *Chanay* and *Orme School*, governs the standard for summary judgment in federal court, the Ninth Circuit has, like Arizona, adopted the rule that an individual may not create an issue of fact by strategically contradicting her own testimony.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (holding that where "the district court makes a factual determination that the contradiction was actually a 'sham,'" the testimony may not preclude the entry of summary judgment).

The court is not convinced that Lauren Sciranko's testimony falls within the rule of *Kennedy*.  It is admittedly somewhat difficult to reconcile the answers to defense counsel's line of questions. Lauren Sciranko explained that the information pertaining to her husband's

23

angina and accompanying medications and treatments was omitted from the application by Kearney's mistake, but she also appears to have indicated otherwise in her terse second answer. It is a stretch to see how defense counsel's second question materially differed from the others so as to explain Lauren Sciranko's unique response. However, there is also scant basis for concluding that Lauren Sciranko strategically contradicted herself to create a "sham" issue of fact to avoid summary judgment. Her second answer was impromptu and entirely unexplained, so it is impossible to divine its rationale, and her answers were otherwise consistent. The court will therefore treat her testimony as genuinely contrary to the testimony provided by Kearney.

Fidelity's uncontroverted evidence that Sciranko failed to disclose angina during his preliminary interview with Kearney over the telephone on September 26, 2001, and again during his examination with Marcella Bappe on October 10, 2001, does not undermine the conclusion that there is a genuine issue of fact. Although that evidence raises serious questions as to Lauren Sciranko's credibility, the persuasiveness of her testimony in light of the contrary evidence is an issue that cannot be decided by the court.

To conclude that there is a genuine issue of fact, however, is not to say that the disputed fact is "material" under Rule 56. Even assuming that Sciranko told Kearney about his history of angina and that Kearney neglected to record that information, Arizona law permits Fidelity to deny coverage on the ground that the condition was undisclosed because Sciranko had an opportunity to review the application and signed the application without making any corrections. *Marine*, 12 Ariz. App. at 230-31, 469 P.2d at 122-23; *Greber*, 43 Ariz. 1, 28 P.2d 817. In providing his signature, Sciranko verified that he "read the questions and answers" and that the "statements made in [the] application are: complete; true; and correctly recorded." Doc. # 45, Exh. 6 at 217. Fidelity had no reason to believe that Sciranko's application contained any misstatements or omissions after obtaining this verification. Kearney testifies that he gave Sciranko an opportunity to review the application at the end of the interview, that Sciranko did review the document, and that Sciranko even read the verification statement prior to providing his signature. Doc. # 45, Exh. 1 at 40-41,

94. While Sciranko disputes whether he actually reviewed the application, he never testifies that Kearney deprived him of an opportunity to do so. Doc. # 45, Exh. 3 at 16, 27. Whether Sciranko took advantage of an opportunity to review the application cannot be a material dispute given that the very purpose of the rule in *Marine* and *Greber* is to place the burden of review on the applicant. The absence of evidence that Kearney induced Sciranko not to review the completed application prior to providing his signature renders inapplicable the rule in *Smith*. 107 Ariz. at 117, 483 P.2d at 532.

### b. Sciranko Was Aware of His History of ASHD and Hyperlipidemia but Did Not Disclose Those Conditions

Even assuming that there is a genuine dispute of material fact pertaining to Sciranko's disclosure of angina, there is no genuine dispute that Sciranko both was aware of and failed to disclose the other preexisting conditions that contributed to his disability. Fidelity proffers an abundance of evidence to satisfy its burden under Rule 56. Gosalia, who first diagnosed Sciranko's ASHD, testifies that he has a "clinical habit" and "blanket policy" of informing patients of his diagnoses and test results, Doc. # 45, Exh. 4 at 8, 32, and his billing records reveal that Sciranko made a total of seven visits for electrocardiogram and other testing in connection with his heart disease between December 1993 and January 1996. Doc. # 35, Exh. E at 1; Doc. # 45, Exh. 4 at 37. In May 1999, when Sciranko first visited Punia, he responded "yes" in response to a question asking whether he ever had "heart disease." Doc. # 35, Exh. D at 1. Punia's personal notes from that visit indicate that he was aware of Sciranko's history of ASHD, hyperlipidemia, and use of aspirin and Lipitor. Given that Punia had yet to "obtain previous medical records and review" at the time he made those notes, the only possible source of his information was Sciranko himself. Doc. # 45, Exh. 6 at 224. Other notes indicate that Sciranko received "coronary artery" "education/counseling" in May 1999 and that he was "informed" of test results showing extremely high levels of cholesterol and triglycerides in his blood on May 25, 2001. Doc. # 45, Exh. 6 at 224, 233. Punia's records also describe lifestyle recommendations for Sciranko, such as "watch salt and fat in diet" and "watch fat and cholesterol in diet," *id.* at 223-24, and indicate that Sciranko's

cholesterol medication was switched from Lipitor to Zocor in March 2000, Doc. # 45, Exh. 6 at 220. Punia testifies that he has a "clinical habit" of discussing diagnoses with patients and that he received his knowledge of Sciranko's heart disease and hyperlipidemia from the patient himself. Doc. # 45, Exh. 5 at 25, 15-17, 19-20.

Sciranko's countervailing evidence is his testimony that he cannot recall whether Gosalia informed him of the diagnosis of ASHD and that he has "no idea" how Punia obtained information about his history of ASHD and hyperlipidemia and accompanying medications during the office visit in May 1999. Doc. # 45, Exh. 3 at 45, 55. Lauren Sciranko also testifies that she does not remember her husband receiving coronary artery education and that Punia never told her husband about the diagnoses of heart disease and hyperlipidemia. Doc. # 45, Exh. 2 at 69-70. This evidence is insufficient to create a genuine dispute for several reasons. First, most of the Scirankos' testimony simply indicates a lack of memory, not that Mr. Sciranko's physicians failed to inform him of his conditions, so it does not contradict the physicians' testimony. Second, even assuming that Lauren Sciranko is correct in testifying that Punia never told her husband about the diagnoses of heart disease and hyperlipidemia, there is still uncontroverted testimony that Sciranko was informed of the test results showing dangerously high levels of cholesterol and triglycerides in his blood, received coronary artery education and counseling, and explained to Punia that he has "heart disease." The evidence that Punia was aware of Sciranko's conditions when he completed his notes from the first office visit in May 1999–without ever reviewing Sciranko's medical record–is also uncontroverted. Coupled with undisputed evidence that Sciranko made seven visits to Gosalia in connection with his heart disease, received multiple electrocardiograms, and received dietary counseling, these facts would simply make it impossible for any reasonable juror to believe that Sciranko was unaware of his serious heart conditions at the time he signed his insurance application. Because Sciranko did not disclose those conditions and they caused his disability, there can be no genuine dispute that Fidelity's exclusion for undisclosed preexisting conditions was properly applied on its own terms.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    There is a Genuine Issue of Material Fact as to Whether Fidelity's Denial of Benefits Violated the Incontestability Clause in Sciranko's Policy**

Having concluded that Fidelity properly applied its underlying coverage exclusion for preexisting conditions, it must now be determined whether Fidelity's benefits determination violated the policy's incontestability clause.  Sciranko contends that the clause prohibited the denial of benefits because more than two years had already passed since the date of issuance. Fidelity argues that the defense was permitted because it concerned policy scope, and the incontestability clause only prohibits challenges to policy validity after two years.  Summary judgment cannot be granted on this issue for the reasons explained below.

**1.    Sciranko's Incontestability Clause Prohibits a Denial of Benefits After Two Years for Mere Neglect to Disclose a Preexisting Condition**

Statutorily mandated terms are typically read into an insurance policy.  *See, e.g.*, *Manuf. Life Ins. Co. v. Capitol Datsun, Inc.*, 566 F.2d 354, 357 (D.C. Cir. 1977).  To the extent that original policy terms conflict with statutory terms, the trick is to identify the terms that provide the most generous coverage.  Statutory language will govern if contrary privately contracted language is less favorable to the insured.  *See, e.g.*, *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 89 Ariz. 253, 360 P.2d 1030 (1961).  Original policy language will govern when it provides coverage that is more generous than that which is required by state law and otherwise comports with public policy.  *See, e.g.*, *Cannizzo v. Guar. Ins. Co.*, 245 Cal. App. 2d 70, 73, 53 Cal. Rptr. 657, 659 (Ct. App. 1966); *Clement v. Atl. Cas. Ins. Co.*, 25 N.J. Super. 96, 103, 95 A.2d 494, 498 (N.J. Super. Ct. Law Div. 1953); *Liljestrand v. State Farm Mut. Auto. Ins. Co.*, 47 Wash. App. 283, 290, 734 P.2d 945, 949 (Ct. App. 1987).

Arizona courts thus determine the scope of incontestability clauses by considering applicable statutory baselines and the particular language of the policy at issue.  The State's statutory minimum for such clauses was originally established by Arizona Code § 61-1017 (1939), which provided as follows:

Benefit certificate requirements.

(a) Each benefit certificate shall provide that . . .

27

1

2

3

4
> The certificate, including any written amendment thereto, and, at the option of the corporation, the application therefor when attached to the policy at the time of issuance, constitute the entire contract between the parties and is incontestable after two [2] years from the date of issuance or two [2] years from the date of last reinstatement, except for non-payment of premiums or assessments.

5 *See Blankenbiller*, 89 Ariz. at 254, 360 P.2d at 1031.

6          The Arizona Supreme Court twice considered the scope of a disputed incontestability

7 clause while this statute was in force.  First, *Posner v. New York Life Insurance Company*,

8 56 Ariz. 202, 106 P.2d 488 (1940), involved a claim for disability benefits that was denied

9 on the ground that ailments preexisting the policy caused the insured's disability.  The

10 incontestability clause in the policy read, "This policy shall be incontestable after two years

11 from its date of issue except for nonpayment of premium."  *See Robison v. Brotherhood of*

12 *R.R. Trainmen Ins. Dept., Inc.*, 73 Ariz. 352, 355-56, 241 P.2d 791, 794 (1952).  The insured

13 argued in part that this language precluded the insurer from denying benefits because more

14 than two years had lapsed since the latest date of issuance.  However, the Arizona Supreme

15 Court found otherwise on the view that the incontestability clause on its terms applied only

16 to defenses attacking the validity of the policy, rather than those contesting the scope of

17 coverage.  Because the insurer had simply argued that the disability was not covered, the

18 incontestability clause and underlying statute presented no bar to the defense.  *Posner,* 56

19 Ariz. at 210, 106 P.2d at 492.

20          The Arizona Supreme Court's second case under the old statute, *Robison*, involved

21 material facts that were virtually identical to those in *Posner*, but held that the policy's

22 incontestability clause barred the insurer from disputing both the validity of the policy and

23 the scope of coverage after two years from the date of issuance.  73 Ariz. at 354-55, 241 P.2d

24 at 793.  The distinguishing feature that justified this unique outcome was the language of the

25 incontestability clause itself, which provided:

26

27

28
> This Certificate will be incontestable and noncancellable by reason of subsequent condition of health.  This Certificate cannot be cancelled by the Brotherhood except for fraud, misrepresentation or for other causes provided in the Constitution and General Rules of the Brotherhood of Railroad

28

Trainmen and the Brotherhood of Railroad Trainmen Insurance Department.  Unless this Certificate is cancelled for any such causes, the acceptance of all renewal premiums when paid on or before the date when due is guaranteed during the lifetime of the Member.

If this Certificate has been in force two years during the lifetime of the Member, it shall be incontestable as to the accuracy of the representations contained in the application herefor and as to the physical condition of the Member on the date hereof, but not as to other causes provided in the Constitution and General Rules of the Brotherhood of Railroad Trainmen and the Brotherhood of Railroad Trainmen Insurance Department.

*Id.* at 353-54, 241 P.2d at 792.  Unlike the clause in *Posner*, which was "general in its terms," *Robison* involved "specific clauses which provided that the policy shall be (1) incontestable and noncancellable by reason of subsequent condition of health, (2) Incontestable after two years as to the accuracy of the representations contained in the application of the policy, and (3) Incontestable as to the physical condition of the member on the date of the policy."  *Id.* at 355, 241 P.2d at 793.  The denial of benefits was therefore impermissible under the plain terms of the policy itself.

After *Posner* and *Robison*, the Arizona Legislature replaced Arizona Code § 61-1017 with Arizona Revised Statutes § 20-1346 (1954) (amended 1980) to establish a new baseline of required language for incontestability clauses in the State.  The relevant portion of this statute now reads:

There shall be a provision as follows:

"Time limit on certain defenses: (a) After two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two year period."

"(b) No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy."

A.R.S. § 20-1346(A) (1980).  Section 1346(A)(a) has been interpreted to mean that "an insurer can only void an insurance policy or deny a claim for loss incurred or disability

29

1   originating two years from the date of issuance of the policy if the insurer proves that the

2   applicant made a fraudulent misstatement in the application for the insurance policy."

3   *Russell v. Royal Maccabees Life Ins. Co.*, 193 Ariz. 464, 466, 974 P.2d 443, 445 (Ct. App.

4   1998).

5       A.R.S. § 20-1346(A)(b) has never been directly interpreted.   Cases that have

6   construed identical or nearly identical incontestability statutes from other states are split on

7   their meaning.  Some focus on the plain language of the statute to hold that coverage may not

8   be denied after two years on the ground that the cause for disability preexisted the issuance

9   of the policy.  *See, e.g.*, *Equitable Life Assurance Soc'y of U.S. v. Poe*, 143 F.3d 1013, 1017-

10  20 (6th Cir. 1998) (applying Michigan law); *Equitable Life Assurance Soc'y of the U.S. v.*

11  *Bell*, 27 F.3d 1274, 1282 (7th Cir. 1994) (applying Indiana law); *Fischer v. Mass. Cas. Ins.*

12  *Co.*, 458 F. Supp. 939, 943-44 (S.D.N.Y. 1978) (applying New York law); *McMackin v.*

13  *Great Am. Reserve Ins. Co.*, 22 Cal. App. 3d 428, 439-40, 99 Cal. Rptr. 227, 234-35 (1971)

14  (applying California law).  Others hold that coverage may be denied after the lapse of the

15  contestability period despite the statutory language.  *See, e.g.*, *Mass. Cas. Ins. Co. v. Forman*,

16  516 F.2d 425, 429 (5th Cir. 1975); *Estate of Doe v. Paul Revere Ins. Group*, 86 Haw. 262,

17  277-81, 948 P.2d 1103, 1118-22 (1987).  The primary justification for these latter cases is

18  the common law principle that incontestability clauses should not be read to expand the

19  scope of coverage.

20      While the split of authority creates a close question, the most reasonable interpretation

21  of A.R.S. § 20-1346(A)(b) prohibits Fidelity from denying benefits more than two years after

22  the issuance of Sciranko's disability policy for his mere neglect to disclose a preexisting

23  condition.  The statute plainly states that an insurer cannot "reduce[] or den[y]" a claim after

24  two years "on the ground that a disease or physical condition not excluded from coverage by

25  name or specific description . . . had existed prior to the effective date of coverage . . . ."

26  A.R.S. § 20-1346(A)(b).  Although the limitation imposed by this section does not apply

27  when a preexisting disease or physical condition is excluded from coverage "by name or

28  specific description," Fidelity's policy does not identify any of Sciranko's heart ailments in

1    that fashion.  The policy exclusion that identifies preexisting conditions as uncovered falls

2    short of the specificity envisioned by the statute because it concerns a general class of

3    conditions and fails to identify any particular condition to which the insurance does not

4    extend.  *See Bell*, 27 F.3d at 1279-80; *Yumukoglu v. Provident Life & Accident Ins. Co.*, 131

5    F. Supp. 2d 1215, 1223 (D.N.M. 2001); *Oglesby v. Penn Mut. Life Ins. Co.*, 889 F. Supp.

6    770, 776-77 (D. Del. 1995); *Fischer*, 458 F. Supp. at 944; *Estate of Doe v. Paul Revere Ins.*

7    *Group*, 86 Haw. 262, 277-78, 948 P.2d 1103, 1118-19 (1997); *Garrell v. Good Citizens Mut.*

8    *Ben. Ass'n*, 204 La. 871, 877-80, 16 So. 2d 463, 465-66 (1943).

9          Insofar as A.R.S. § 20-1346(A)(b) conflicts with the general principle that an

10   incontestability clause should not expand the scope of coverage, the general principle must

11   yield to the specific language of the statute.  This conclusion flows in part from our system's

12   hierarchical classification of legal authorities.  It is well established that a State may, by

13   legislative enactment, "freely alter, amend or abolish the common law within its

14   jurisdiction."  *Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Mkt. Ass'n*,

15   276 U.S. 71, 89 (1928); *see also Louis Pizitz Dry Goods Co. v. Yeldell*, 274 U.S. 112, 116

16   (1927); *Fujioka v. Kam*, 55 Haw. 7, 10, 514 P.2d 568, 570 (1973); *Vogts v. Guerrette*, 142

17   Colo. 527, 533, 351 P.2d 851, 855 (1960).  However uniformly and persuasively the common

18   law may indicate that incontestability clauses should not expand the scope of insurance

19   coverage, the Arizona Legislature was free to disregard that precedent in passing A.R.S. §

20   20-1346(A)(b).

21         The preeminence of the plain language of section 20-1346(A)(b) also finds support

22   in *Robison*.  Much like Sciranko's policy, the insurance contract in that case contained a

23   provision that excluded coverage for preexisting conditions.  *Robison* nevertheless held that

24   the insurer could not deny benefits on the basis of that exclusion because the specific

25   language of the incontestability clause "in effect nullified" the exclusion after two years.  73

26   Ariz. at 356, 241 P.2d at 794.  The insurer was therefore required to provide coverage for the

27   insured's condition even though the condition was not originally covered under the insurance

28   contract.  Given that A.R.S. § 20-1346(A)(b) is comparably specific in prohibiting the denial

31

of coverage for preexisting conditions after two years and is incorporated by law into Sciranko's policy, it, too, permissibly effects a limited expansion of the scope of coverage after the contestability period notwithstanding the common law.

This interpretation of section 20-1346(A)(b) is consistent with *Posner*, which was decided in light of an old statutory baseline that did not bar insurers from denying coverage more than two years after the issuance of a policy on the basis of exclusions for preexisting conditions. Under section 20-1346(A)(b), the outcome is necessarily different. Nothing in *Posner* suggests that the Arizona Supreme Court meant to pronounce a categorical rule that, regardless of underlying statutory requirements and contract language, all incontestability clauses necessarily pertain exclusively to defenses challenging the validity of an insurance policy. Indeed, that approach would be contrary to the wide body of state precedent that looks to the particular language of the disputed clause to determine its unique scope. *See Robison*, 73 Ariz. at 355-56, 241 P.2d at 794 (distinguishing *Posner* based on the terms of the incontestability clause at issue); *Cannizzo*, 245 Cal. App. 2d at 73, 53 Cal Rptr. at 659 (permitting departures from statutory language that are favorable to the insured); *Clement*, 25 N.J. Super. at 103, 95 A.2d at 498 (same); *Liljestrand*, 47 Wash. App. at 290, 734 P.2d at 949 (same).

The conclusion that section 20-1346(A)(b) prohibits Fidelity from denying benefits after the contestability period on the basis of a preexisting is also consistent with *Halstead Consultants, Inc. v. Continental Casualty Co.*, 181 Ariz. 459, 891 P.2d 926 (Ct. App. 1994), which held that an incontestability clause founded on A.R.S. § 20-1260 prohibited an insurer from finding over two years after the issuance of a group life insurance policy that the insured's employment status rendered him ineligible for benefits. *Halstead* relied on the "traditional proposition" that incontestability clauses bar an insurer from challenging, after expiration of the contestability period, the validity of an insurance policy, but not the scope of coverage. 181 Ariz. at 463, 891 P.2d at 930. That reliance could be interpreted to suggest that Fidelity may not challenge Sciranko's claim after two years on the basis of the preexisting nature of his conditions because such a challenge goes to policy scope rather than

32

validity.  However, the validity-scope distinction was relevant in *Halstead* only because it was consistent with the language of the governing statute, which expressly stated that the "*validity* of the policy shall not be contested" after the statutory period (emphasis added). A.R.S. § 20-1260.  Unlike section 20-1260, section 20-1346(A)(b) derogates from the common law limitation of incontestability clauses to validity defenses by explicitly prohibiting insurance companies from asserting preexistence, an issue of policy scope, as a defense to coverage after the contestability period.  Common law principles pertaining to incontestability cannot trump the clear language of this statute.  *See Ry-Tan Constr., Inc. v. Wash. Elementary Sch. Dist. No. 6*, 210 Ariz. 419, 422, 111 P.3d 1019, 1022 (2005) (explaining that the legislature can modify or abrogate the common law if it clearly expresses an intent to do so).

Fidelity relies on *Button v. Connecticut General Life Insurance Company*, 847 F.2d 584 (9th Cir. 1988), for the proposition that it may deny coverage for a preexisting condition over two years after the issuance of Sciranko's policy despite A.R.S. § 20-1346(A)(b). Because the parties strongly dispute *Button's* significance, its facts and holding will be explained in detail.  The insurance policy in *Button* permitted lifetime payments to the insured in the event of a disability caused by injury, but only up to 60 months of payments for a disability caused by sickness.  The policy did not provide coverage for either injuries or sicknesses occurring prior to the date of issuance.  Several years after the policy issued, the insured became disabled by a back injury.  The insurer originally classified his claim as arising out of injury and accordingly set aside a lifetime reserve for benefit payments.  Later, however, the insurer reclassified the claim as arising out of sickness in light of evidence that the insured suffered from a disease that preexisted the issuance of the policy and that contributed to his back injury.  The reclassification enabled the insurer to terminate benefits under the policy provision limiting payments for sicknesses to no more than 60 months.

The insured in *Button* argued that the termination of benefits was improper for two reasons.  First, he claimed that he should have remained eligible for the lifetime payments because the exclusive cause of his disability was in fact his injury, not his sickness.  Second,

he argued that, regardless of the cause of his disability, the termination of benefits contravened his policy's incontestability clause because the sickness on which the termination was based preexisted the policy.  The incontestability clause stated:

> *Incontestable.*  (a) After this policy has been in force for a period of two years during the lifetime of the Insured (excluding any period during which the Insured is disabled), it shall become incontestable as to the statements contained in the application.
>
> (b) No claim for loss incurred or disability (as defined in the policy) commencing after two years from the Date of Issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy.

847 F.2d at 587.  *Button* rejected both of the insured's arguments.  After finding that the preexisting disease contributed to the disability and that the insurer therefore properly classified the claim as arising out of a sickness, *Button* surveyed *Posner*, *Robison*, and A.R.S. § 20-1346 and explained that the incontestability clause did not bar the termination of benefits.

Fidelity misconstrues the reasoning behind the holding in *Button*.  *Button* did not uphold the termination of benefits in spite of A.R.S. § 20-1346(A)(b), but rather because the statute on its face presented no barrier to the decision actually made by the insurer.  The critical fact was that the insurer terminated benefits because of the substantive nature of the condition that created the disability (i.e., sickness, not injury), rather than because of the temporal context in which the condition arose (i.e., pre- instead of post-issuance of the policy).  847 F.2d at 589.  Although it appears that the insurer theoretically could have terminated benefits on the ground that the sickness preexisted the issuance of the policy, the insurer did not take that course, so its action did not run afoul of *Robison* or A.R.S. § 20-1346(A)(b), both of which simply address adverse benefits decisions that are based on the preexisting nature of an insured's condition.  *See Button*, 847 F.2d at 589 ("[Defendant] does not argue that Button's claim is barred because his [disease] predated the policy. [It] merely contends that the disease, *regardless of when it arose*, contributed to Button's disability. The determining factor here is causation, not the insured's physical condition on the date of the

34

1    policy.") (emphasis in original). *Button*, therefore, does not somehow override or render

2    irrelevant the language of A.R.S. § 20-1346.

3         *Button* does contain certain language suggesting that benefits may be denied for

4    preexisting conditions even after the close of the contestability period. *See* 847 F.2d at 588

5    ("We believe the better-reasoned view is that the incontestability clause relates to the validity

6    of the contract and not to the construction of policy provisions."). However, given the issue

7    actually contested in *Button*, that general language is dictum which need not be followed.

8    *See FDIC v. McSweeney*, 976 F.2d 532, 535 (9th Cir. 1992) (explaining that a judicial

9    statement on an uncontested issue is not a holding). The absence of any specific exegesis of

10   the critical language of section 20-1346(A)(b) also suggests that *Button* did not rule on the

11   permissibility of a denial of benefits for preexisting conditions after the close of the

12   contestability period. The court respectfully disagrees with those cases that have viewed the

13   dictum in *Button* as its holding. *See, e.g.*, *Peterson v. Equitable Life Assurance Soc'y of the*

14   *U.S.*, 57 F. Supp. 2d 692, 701 (W.D. Wis. 1999); *Oglesby*, 889 F. Supp. at 776.

15         **2.    The Incontestability Clause Permits a Denial of Benefits After Two**
16              **Years in the Case of Fraud, But Fraud Has Not Been Argued on**
                **this Motion**

17         Although an insured's mere neglect to disclose a preexisting condition in an insurance

18   application cannot be the basis for denying a claim more than two years after the issuance

19   of a disability policy, A.R.S. § 20-1346(A)(a) permits a denial of benefits even outside the

20   two-year contestability period if the insured made "fraudulent misstatements" about his

21   preexisting conditions in the application. Fidelity's Answer to the Complaint raises the

22   affirmative defense of fraud. Doc. # 5 at 4. The current evidence also strongly suggests

23   fraud in the insurance application. Sciranko's decision not to seek any disability benefits

24   within the two-year contestability period even though he received six-vessel aorto-coronary

25   bypass surgery three months after the issuance of his policy and suffered from all of the heart

26   ailments that subsequently led him to seek benefits after the two-year period looks like an

27   attempt to conceal his heart conditions temporarily and to game coverage through a

28   strategically delayed claim. Nevertheless, A.R.S. § 20-1346 places the burden on the insurer

1   to prove fraud by an applicant, *Russell*, 193 Ariz. at 466, 974 P.2d at 445, and Fidelity's

2   Motion does not argue fraud as a ground for summary judgment.  Summary judgment

3   therefore cannot be granted on Count I.

4          To the extent that Sciranko opposes the Motion on the ground that Fidelity violated

5   the incontestability clause regardless of fraud, his argument is unpersuasive.  It is true that,

6   unlike A.R.S. § 20-1346(A)(a), the text of section 20-1346(A)(b) contains no express fraud

7   exception.  Read literally, the absence of such an exception could be interpreted to preclude

8   after two years a denial of benefits that is based on the fraudulent omission of preexisting

9   conditions from an insurance application.  However, that interpretation is unconvincing.  "It

10   is a well-settled canon of statutory construction that the provisions of a unified statutory

11   scheme should be read in harmony, leaving no provision inoperative or superfluous or

12   redundant or contradictory."  *Holley v. United States*, 124 F.3d 1462, 1468 (Fed. Cir. 1997).

13   Sections 20-1346(A)(a) and (A)(b) both address the permissibility of a denial of benefits

14   made after the two-year contestability period.  To say that an insurer cannot deny a claim

15   after two years on the basis of a fraudulent misstatement in an application simply because the

16   misstatement concerns the insured's preexisting conditions contradicts the language of the

17   exception for the fraud defenses in section 20-1346(A)(a), which does not restrict the

18   availability of the fraud defense based on the subject matter of the fraud.  Other courts that

19   have addressed this issue have found similarly.  *See, e.g.*, *Kersten v. Minn. Mut. Life Ins. Co.*,

20   608 N.W.2d 869, 875 (Minn. 2000) ("If the insured intentionally withholds information

21   about a known pre-existing condition, then clause (a)'s fraud exception permits the insurer

22   to void the policy."); *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190, 210, 644 A.2d 1098,

23   1108 (N.J. 1994) ("We hold that the statutory language that precludes a defense based on a

24   pre-existing disability does not protect insureds who make fraudulent misrepresentations in

25   their applications.").

26          Even assuming that Fidelity's defense is governed exclusively by section 20-

27   1346(A)(b), the fraud exception in section 20-1346(A)(a) should be construed as implicitly

28   operative in section (A)(b).  The express exception in the first section evinces a general

1    legislative intent to ensure that incontestability clauses do not operate as shields for fraud.

2    There is no reason to believe that the Arizona Legislature would be any less concerned with

3    fraud simply because it happens to concern an insured's preexisting conditions.

4        The survival of the defense of fraud after the close of the contestability period also

5    comports with the privately contracted language of Sciranko's insurance policy.  Although

6    the policy does not expressly reserve Fidelity's right to raise that defense outside the

7    contestability period, neither does it expressly waive that right or otherwise contradict the

8    fraud exception that is automatically incorporated by A.R.S. § 20-1346(A)(a).  A waiver of

9    the fundamental defense of fraud cannot be inferred on the sole ground that the privately

10   contracted policy language does not affirmatively preserve Fidelity's right to deny claims on

11   the basis of fraud.  The defense of fraud is preserved unless specifically waived.  *See, e.g.*,

12   *Mfrs. Hanover Trust v. Yanakas*, 7 F.3d 310, 316-17 (2d Cir. 1993) (explaining that waiver

13   of the defense of fraud must be specific); *Shelby Elec. Co. v. Forbes*, 205 S.W.3d 448, 455-

14   56 (Tenn. Ct. App. 2005) (same).

15       In summary, the Motion for Summary Judgment will be denied with respect to Count

16   I.  Although there is no genuine dispute of material fact concerning whether the coverage

17   exclusion for undisclosed preexisting conditions applied on its own terms, Fidelity's

18   compliance with the incontestability clause hinges on whether Sciranko fraudulently omitted

19   his preexisting conditions from the insurance application, and the Motion did not present

20   argument or evidence on that issue.  The fraud defense to Count I is left for trial.

21   **V.    Fidelity Did Not Exhibit Bad Faith in Processing and Denying Sciranko's Claim**

22       Fidelity alternatively moves for partial summary judgment with respect to Count II

23   on the ground that it acted reasonably in processing and denying Sciranko's claim.  Arizona

24   law implies a covenant of good faith and fair dealing "in every contract."  *Rawlings v.

25   Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 570 (1986).  The remedy for breach of the

26   implied covenant is "ordinarily on the contract itself."  *Id.* at 158, 726 P.2d at 574.  However,

27   tort recovery may be permitted where the contract "creates a relationship in which the law

28   implies special duties not imposed on other contractual relationships."  *Id.*, 726 P.2d at 574.

Insurance contracts fall into this category because they impose on the insurer "some duties of a fiduciary nature," including equal consideration, fairness, and honesty. *Id.* at 155, 726 P.2d at 571.

To commit the tort of bad faith, an insurer must (1) act unreasonably toward the insured and (2) either know that it was acting unreasonably or demonstrate such reckless disregard to the reasonableness of its actions that knowledge of unreasonableness may be imputed. *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d 125, 134 (1986). The first element of this test is objective and asks whether the insurer acted in a "manner consistent with the way a reasonable insurer would be expected to act under the circumstances." *Id.*, 735 P.2d at 134. The second element is subjective and requires "consciously unreasonable conduct." *Id.*, 735 P.2d at 134. The insurer may commit bad faith not only by intentionally and unreasonably denying a claim, but also by intentionally processing, evaluating, or paying a claim in an unreasonable manner. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000). Liability will not attach if the insured's claim is "fairly debatable" from an objective standpoint and is subjectively perceived as such by the insurer. *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1095 (D. Ariz. 2003).

Punitive damages may be recovered on top of compensatory damages if the insured demonstrates that the insurer not only acted in bad faith, but also with "evil motives." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. Such motives entail an intention to injure or "consciously pursue[] a course of conduct knowing that it create[s] a substantial risk of significant harm." *Id.*, 726 P.2d at 578. This rule envisions "conduct involving some element of outrage similar to that usually found in crime." Restatement (Second) of Torts § 908 cmt. b.

Sciranko contends that Fidelity exhibited bad faith by engaging in the following activity:

- Denying benefits on the basis of Sciranko's preexisting conditions despite a state statute and an incontestability clause that prohibited it from doing so.

●     Misrepresenting policy provisions and terms to Sciranko.

●     Choosing not to obtain a complete statement from Gosalia on the nature and extent of Sciranko's disability even after alleging that the statement was important to the claims process.

●     Refusing to consult with Sciranko's physicians over the telephone.

●     Relying exclusively on medical records provided by Punia that did not address heart attacks suffered by Sciranko in 2003 and 2005.

●     Failing to request medical and employment records until several weeks after receiving the claim.

●     Allowing its employees to adjust claims in Arizona without providing them with an understanding of the duty of equal consideration.

Doc. # 47 at 15.  In support of these arguments, Sciranko marshals expert testimony from Mary E. Fuller, the owner of a disability claims consulting service.  Fuller opines that Fidelity violated the duty of good faith and fair dealing by conducting an inadequate investigation of Sciranko's medical records and vocational abilities, failing to consider evidence indicative of permanent disability, prioritizing its financial interests over Sciranko's health by declining benefits despite the presence of disability, failing to promptly and accurately notify Sciranko of its investigation into his preexisting conditions, declining to make timely payment of benefits, failing to establish procedures to guarantee compliance with standard industry obligations, misunderstanding the language and meaning of Sciranko's policy, and failing to understand the applicable laws of Arizona and the Ninth Circuit.  Doc. # 35, Exh. K.

Sciranko's arguments are unpersuasive.  Summary judgment will be granted on Count II of the Complaint because the record shows that Fidelity processed and denied Sciranko's claim in an objectively reasonable fashion and because, even assuming that Fidelity acted unreasonably, there is no evidence to suggest that Fidelity acted in reckless disregard to the reasonableness of its conduct or subjectively understood its conduct to be unreasonable. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105-06.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.   There is No Genuine Dispute that Fidelity Acted in an Objectively Reasonable Fashion

With respect to the first element of the tort of bad faith, Fidelity has proffered significant evidence that its conduct was objectively reasonable.  Barger and Laws both concluded that the claim should be denied because medical records obtained from Punia showed that Sciranko's conditions preexisted the issuance of the policy.  This decision reflected a reasonable assessment of the applicable law.  As explained above, Barger and Laws not only reasonably applied the policy exclusion for undisclosed preexisting conditions, they correctly applied that exclusion according to its plain terms.  The evidence and federal case authority also establish that Fidelity's interpretation of the incontestability clause was reasonable, even though ultimately incorrect.  Laws and Barger understood from both Ninth Circuit precedent and legal summaries produced by the American Counsel of Life Insurers that incontestability clauses in Arizona only pertain to defenses challenging the validity of a policy, rather than defenses concerning exclusions under an admittedly valid policy.  Dictum in *Button*, the only Ninth Circuit authority to address the issue for Arizona, provided particularly significant support for this view.  *See* 847 F.2d at 588 ("We believe the better-reasoned view is that the incontestability clause relates to the validity of the contract and not to the construction of policy provisions.").  The privately contracted language of Sciranko's insurance policy also left ample room to discount the relevance of the incontestability clause because it did not explicitly address the applicability of policy exclusions after the close of the contestability period.

The second claim of bad faith, which asserts misrepresentation of policy terms, is completely unexplained.  If the argument is that Fidelity is liable for bad faith because Kearney misrepresented Sciranko's preexisting conditions in the insurance application, Kearney's conduct cannot warrant relief because the tort of bad faith arises when an insurer "intentionally denies, fails to process or pay a claim without a reasonable basis."  *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).  It is unclear how Kearney's purported misrepresentation could have caused Fidelity to deny benefits or fail to

40

1  process the claim.  Indeed, if undetected, Kearney's misrepresentation would have only

2  increased Sciranko's chances of obtaining benefits by concealing illnesses that would have

3  disqualified him from coverage.

4      Nor can the evidence be read to indicate that Fidelity acted unreasonably in processing

5  Sciranko's claim.  The company requested that Gosalia completely fill out his own Physician

6  Statement because some portions of it were essentially impossible to read and there was no

7  way of knowing whether Gosalia agreed with Lauren Sciranko's initialed additions.  Without

8  being able to actually read or ensure the credibility of the Statement, Fidelity had no reason

9  to credit its contents.  The company's refusal to obtain Gosalia's complete assessment by

10  telephone was explained as reflecting a standard practice of creating a paper trail for

11  reference in the event of a claim dispute.  In requiring power-of-attorney documentation prior

12  to directing its correspondence to Lauren Sciranko instead of Plaintiff, Fidelity simply

13  followed an internal policy aimed at ensuring compliance with federal privacy regulations.

14  Sciranko proffers no argument as to how any of these facially valid explanations are

15  unreasonable.

16      Sciranko next faults Fidelity for relying exclusively on medical records provided by

17  Punia and neglecting to consider evidence of heart attacks suffered in 2003 and 2005.  While

18  it is true that Fidelity only reviewed Punia's records and did not ultimately obtain a

19  completed and legible statement from Gosalia, there can be no doubt that the company

20  nevertheless acted reasonably.  From Punia's records alone, it was obvious that Sciranko had

21  undisclosed heart conditions that preexisted the issuance of the policy and caused his

22  disability.  Barger and Laws thus had ample basis to believe that the claim for benefits fell

23  within the terms of the coverage exclusion for preexisting conditions.  Because evidence of

24  heart attacks subsequently suffered in 2003 and 2005 had no logical bearing on the

25  applicability of the exclusion, there was no need to consider that additional evidence.

26      Sciranko also argues that Fidelity acted unreasonably by failing to request medical and

27  employment records until several weeks after receiving the claim.  The argument is again

28  unavailing because the evidence uniformly establishes that the delays were reasonable in the

1   circumstances. The claim was filed on April 18, 2005. Fidelity's first responded on May 10,

2   2005, with a letter explaining that Gosalia's statement was unacceptable because it was

3   illegible and incomplete. Sciranko nevertheless refused to obtain a completed statement and

4   instead resubmitted the original on May 14. By May 24, Fidelity had started to collect

5   Sciranko's medical records. Doc. # 45, Exh. 6 at 117. On June 23, 2005, Fidelity was still

6   without a completed statement from Gosalia or records from Punia. Fidelity sent out the

7   request for a statement from Sciranko's former employer at this time, but the employer never

8   responded. Fidelity then denied coverage on July 28, 2005.

9        There is no basis for concluding that the delay involved in the claim processing was

10   either unjustified or unreasonably lengthy. The delay was caused in substantial part by the

11   non-responsiveness of Sciranko and third parties to Fidelity's requests. Even the

12   approximate extent of the delay for which Fidelity was responsible did not by any means

13   constitute an unreasonable length of time. *Cf. Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.

14   App. 4th 1450, 1459, 36 Cal. Rptr. 2d 229, 233-34 (Ct. App. 1994) (finding a delay of four

15   months between the notice of claim and payment to be sufficiently reasonable to warrant

16   summary judgment against a claim of bad-faith delay).

17        Sciranko next asserts that Fidelity acted unreasonably by allowing its employees to

18   adjust claims in Arizona without providing them with an understanding of the duty of "equal

19   consideration." Under Arizona law, an insurer is required to "give equal consideration in all

20   matters to the insured's interests." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174,

21   176, 913 P.2d 1092, 1094 (1996). This duty prohibits the insurer from "gain[ing] an unfair

22   advantage of its insured through conduct that invades the insured's right to honest and fair

23   treatment." *Zilisch*, 196 Ariz. at 237-38, 995 P.2d at 280.

24        The court rejects this argument, which Sciranko rests on Barger's mere unfamiliarity

25   with the legal meaning of the term "equal consideration" during his deposition. Doc. # 45,

26   Exh. 8 at 17-18. Regardless of whether Barger is familiar with that technical term, it is

27   abundantly clear that he understood its substantive import and made efforts to act

28   accordingly. It is also clear that Fidelity made substantial efforts to instruct its claims

examiners on the importance of fair and expeditious claims review.  Barger, for example, testifies that he always made efforts to act in accordance with the Fair Claims Practices Act, respond promptly to customer complaints, review claims thoroughly, and compare case facts with policy language.  Doc. # 45, Exh. 8 at 16.  Laws similarly made substantial efforts to train Fidelity's claims examiners to process claims in a thorough and fair manner.  *See supra* at 15, ln. 19-24.  Fidelity cannot be liable for bad faith simply because Barger does not understand some legal terminology used by Plaintiff's counsel during a deposition.

Finally, it is noted that Fuller's testimony fails to create a genuine dispute of material fact.  Having conceded a complete unawareness of relevant Arizona and Ninth Circuit law, Doc. # 35, Exh. K at 2-4, she could not competently opine that Fidelity failed to "know and understand the applicable laws of the controlling jurisdiction and to administer their insureds' claims accordingly," Doc. # 45, Exh. 10 at 18.  Upon scrutiny, she retracted her initial testimony that Fidelity acted unreasonably by evaluating claims without providing underwriting guidelines to its staff because Fidelity did in fact utilize such guidelines.  Doc. # 35, Exh. K at 7.  Fuller's testimony also demonstrates no awareness of the specific explanations for the claim handling that were articulated by Barger and Laws, and it utterly disregards the fact that the policy exclusion for undisclosed preexisting conditions rendered superfluous an exhaustive review of the nature and effect of Sciranko's disability.

### B.   Even Assuming that Fidelity Acted Unreasonably, There is No Evidence that Fidelity Acted in a Consciously Unreasonable Manner

Sciranko asserts that the second requirement for bad faith has been satisfied by Kearney's misrepresentations in the application, Fidelity's decision not to consult Gosalia's records prior to denying benefits, and Fidelity's violation of the incontestability clause and A.R.S. § 20-1346.  No reasonable juror could agree.  There is simply no evidence that Fidelity's agents acted recklessly with regard to the reasonableness of the processing and denial of Sciranko's claim, or that they otherwise subjectively understood their conduct to be unreasonable.  *Cf. Milhone*, 289 F. Supp. 2d at 1102 (granting summary judgment against a bad-faith claim under Arizona law).  Fidelity has shown that its agents consistently acted

1    in good faith reliance on reasonable company policies while processing Sciranko's claim.

2    *See* Doc. # 45, Exh. 8 at 50-51; Doc. # 45, Exh. 2 at 35, 39-40, 52-53, 64-65.

3         For these reasons, the motion for summary judgment will be granted with respect to

4    Count II of the Complaint.  Sciranko is accordingly not entitled to compensatory or punitive

5    damages for bad faith.

6         IT IS THEREFORE ORDERED that the Motion for Summary Judgment (Doc. # 34)

7    is DENIED in part and GRANTED in part.  The Motion is DENIED with respect to Count

8    I of the Complaint (Breach of Contract) and GRANTED with respect to Count II of the

9    Complaint (Bad Faith).

10        DATED this 3rd day of August 2007.


12        _____

13                     Neil V. Wake
                United States District Judge

44